HARRIET ANDERSON *et al.*, Plaintiffs-Appellees, v. CHESAPEAKE
AND OHIO RAILWAY COMPANY, Defendant-Appellant.

First District (3rd Division)   No. 83—1983

Opinion filed September 17, 1986.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, Charles H. Cole, and Joshua G. Vincent, of counsel), for appellant.

Hayes & Power, of Chicago (Joseph A. Power, Jr., and David A. Novoselsky, of counsel), for appellees.

JUSTICE McGILLICUDDY delivered the opinion of the court:

As a result of a car-train collision in northwestern Indiana, plaintiffs Harriet Anderson, National Boulevard Bank of Chicago, as administrator of the estate of Anthony T. Anderson, a minor, deceased, Nedra Anderson, and Nathan Anderson brought suit against defendant, Chesapeake & Ohio Railway Company (C&O). Plaintiffs' 16-count amended complaint included allegations of wrongful death, negligence, and wilful and wanton misconduct. The suit prayed for both compensatory and exemplary damages.

This court granted C&O's petition for leave to appeal from the trial court's granting of a mistrial and ordering a new trial on all issues in the case. On appeal, C&O contends that: (1) the trial court's granting of a mistrial based upon the jury's "inconsistent verdicts" was erroneous; (2) the trial court erred in denying defendant's motion for a directed verdict on the wilful and wanton counts at the close of plaintiffs' presentation of the evidence; (3) the trial court erred in granting a new trial on the issues involving compensatory damages, and (4) the court erred in its refusal to strike the testimony of plaintiffs' expert witness.

On May 28, 1974, Harriet Anderson, an Illinois resident, was driving her car eastbound on Route 30 in Lake County, Indiana. Seated in the passenger's seat was Mrs. Anderson's daughter, Nedra. Behind Mrs. Anderson was her son, Nathan, and another son, Anthony, was seated behind Nedra. On the morning in question, the road was dry and the traffic moderate to heavy. Harriet Anderson was traveling at a speed of 40 to 45 miles per hour.

Route 30 is a four-lane divided highway with a posted 50 mile-per-hour speed limit. A single railroad crossing, under the control of

C&O, intersects Route 30 in a general northwest to southeast direction. For a car traveling eastbound, the approach angle of the train would be approximately 150 degrees. The crossing has advance warning signs and cross-bucks with flasher signals. Harriet Anderson had traveled Route 30 many times and was familiar with the particular railroad crossing.

On the morning of the accident, Mrs. Anderson was traveling in the left lane, closest to the center of the highway. A C&O locomotive pulling a second locomotive and a caboose was heading northwest toward Chicago. The east sight line was an open flat field with an empty billboard frame and some bushes. Harriet Anderson testified that she saw the advance warning signs and recalled seeing traffic to the right side of her vehicle. The radio and air conditioning were on in the car, and the windows were closed. She did not hear the train's bell or whistle, nor did she see the headlights. Mrs. Anderson testified that, in fact, she did not see the train prior to the accident and became aware of it only immediately before impact when her daughter called out, "Mommy, there's a train." Both Nedra and Nathan Anderson indicated that they also were unaware of the train until that time.

Roger Leedy, the locomotive engineer, testified that when he realized the Anderson vehicle had entered the crossing, he engaged the emergency brake. He stated that the train was traveling at a speed of 50 miles per hour in a 60 mile-per-hour zone. The train struck the car on the right passenger side and sheared it in half. Harriet and Nedra Anderson remained strapped in their seats, while Nathan and Anthony were thrown from the car. All four suffered injuries, and, as a result, Anthony died four days later.

Several witnesses testified that they observed the flashing signals working prior to the collision, although there was conflicting evidence as to the period of time they were flashing. These signals were triggered by a relay switch 1,938 feet from the crossing. The signals had been tested on two occasions in the month prior to the accident as well as on the day of the occurrence and found to be in proper working order. The locomotive engineer testified that he had blown the train whistle at the whistle post which was 1,000 feet from the crossing. Witnesses also testified that they heard blasts of the train horn and whistle as the train approached and as it entered the crossing, up until the time of the accident.

During the jury instruction conference, defense counsel expressed concern that the instruction regarding exemplary damages would confuse the jury members. He complained that, whereas the

other verdict forms provided the jury with an explicit option to sign or not, the exemplary damages verdict form provided that the jury members should sign only if they all agreed that such damages should be awarded. The trial court suggested that a second paragraph be added to the form to instruct the jury to return the verdict form unsigned or unused if members decided not to award exemplary damages. Plaintiffs' counsel agreed to have the amended verdict form and instruction prepared for the following day; however, this material was not submitted.

During deliberations, the trial court received a question from the jury asking: "On the exemplary damages, must all jurors agree on the amount or can the majority sign the verdict?" The court responded that the verdict had to be unanimous. The jury then asked whether they could sign only three forms if they were unable to come to a decision on the fourth form. After determining that the form in question was the exemplary damages form, the court responded in a note, stating:

"If you are in agreement as to the awarding of exemplary damages, you must be in agreement as to the amount, and you must all sign the verdict form. If you are not in agreement as to the awarding of exemplary damages or in agreement as to the amount thereof, then you need not sign the verdict form. Give due consideration to this matter."

On the compensatory damages issues, the jury found unanimously for the plaintiffs. Nedra Anderson was awarded $4,500; Nathan Anderson, $2,000; the estate of Anthony Anderson, $30,000; and Harriet Anderson, $12,000. The jury further found that the percentage of negligence that was a proximate cause of Harriet Anderson's injury attributable to her was 71%. Her award was reduced by this percentage. In the wrongful death action, the jury awarded Nedra and Nathan $2,750 each. Harriet Anderson was awarded $15,000, which also was reduced by 71%, the percentage of negligence that was the proximate cause of the death of Anthony Anderson attributable to her.

Eight of the eleven jurors signed the exemplary damages verdict form, assessing $200,000 in damages. The court stated, "That verdict is returned incomplete. *** The Court will enter judgment." Judgment for $200,000 was entered on June 16, 1982.

In post-trial motions, plaintiffs moved for a new trial on all issues and for a new trial on the exemplary damage counts only. Defendants moved for judgment notwithstanding the verdict on the issue of exemplary damages as well as to vacate the exemplary dam-

age verdict.

On June 21, 1983, the trial court vacated the $200,000 exemplary damage judgment as having been entered erroneously by the clerk of the court. On August 2, 1983, the court denied C&O's motion for judgment notwithstanding the verdict, plaintiffs' motion for a new trial on the exemplary damages issues, and plaintiffs' motion for a new trial on all the issues. The court then declared a mistrial based upon the "inconsistency of the verdicts," ordered a new trial on all issues, and vacated all judgments entered on June 16, 1982. Trial was rescheduled for September 2, 1983.

■ Defendants first contend that the trial court erred in granting a mistrial and ordering a new trial on all issues based on the "inconsistency of the verdicts." The granting of a mistrial is within the sound discretion of the trial court and will not be disturbed on review absent a clear abuse of discretion. (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 844, 462 N.E.2d 645; *Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249.) Inconsistent verdicts typically are found where a jury has returned both general and special verdicts that are not in accord with one another. (See *Moricoli v. P&S Management Co.* (1982), 104 Ill. App. 3d 234, 432 N.E.2d 903.) As previously discussed, the jury found in favor of plaintiffs on the compensatory damages issues, but on the exemplary damages issues, only 8 of the 11 jurors signed the verdict form. Therefore, there was effectively no verdict for either plaintiffs or defendant on the exemplary damages issues. (See, *e.g.*, *Roadruck v. Schultz* (1948), 333 Ill. App. 476, 490-91, 77 N.E.2d 874.) Because there was a verdict only on the issues involving compensatory damages, we find that the trial court erred in declaring a mistrial on the basis of "inconsistent verdicts."

■ C&O contends that the trial court should have directed a verdict in its favor on the wilful and wanton counts at the close of plaintiffs' presentation of the evidence. The question of whether there has been wilful and wanton misconduct generally is a question of fact to be determined by a jury. (*Hadley v. Witt Unit School District 66* (1984), 123 Ill. App. 3d 19, 22, 462 N.E.2d 877.) When, however, all of the evidence viewed in its aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand, the verdict should be directed. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

Plaintiffs, in their third amended complaint, alleged that C&O was guilty of wilful and wanton misconduct and, therefore, liable for

exemplary damages. In *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293, the supreme court described such conduct as follows:

> "A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care."

We thus address the evidence that was before the court to determine if it erred in denying C&O's motion for a directed verdict.

Plaintiffs argue that the testimony of their expert, together with that of witnesses to the accident and a history of prior accidents at the Route 30 crossing, sufficiently established a basis for a finding of wilful and wanton conduct. Dr. John Baerwald, a traffic engineer, testified as an expert witness for the plaintiffs. Although he conceded that the flashing-light crossing protection at Route 30 generally complied with Indiana guidelines, he testified that the Route 30 crossing, nevertheless, was extrahazardous. In his opinion, the existing level of protection was inadequate for the amount of vehicle and train traffic at the intersection. Plaintiffs contended that the crossing was inadequately protected because no crossing gates stood at the intersection. However, Dr. Baerwald admitted upon cross-examination that the addition of gates would not necessarily have prevented the Anderson accident or any other vehicle-train collision. Although plaintiffs emphasized that the crossing also had an obstructed view, Dr. Baerwald and other witnesses testified that the southwest quadrant in which the train approached the Anderson vehicle was an open, flat field with some bushes and an empty billboard frame. The record is lacking in evidence that the bushes or billboard actually blocked a motorist's view.

■■ Plaintiffs further argue that the testimony of witnesses to the accident substantiates their allegations of wilful and wanton conduct in failing to give adequate warning of the train's approach. Roger Leedy, the locomotive engineer, testified that he blew the train whistle at the whistle post which was 1,000 feet from the crossing. Indiana law, however, requires that a train whistle be sounded beginning not less than 80 rods, or 1,320 feet, from a crossing (Ind. Code Ann. sec. 8—6—4—1(a) (West 1982)), and violation of this statutory requirement is considered to be negligence *per se.* (See, *e.g., Smith v. Chesapeake & Ohio R.R. Co.* (1974), 160 Ind.

App. 256, 261-62, 311 N.E.2d 462, 466; *Pennsylvania R.R. Co. v. Rizzo* (1949), 119 Ind. App. 505, 509, 86 N.E.2d 91, 92, *rehearing denied* (1949), 119 Ind. App. 514, 515, 87 N.E.2d 885, 886.) Nevertheless, we do not believe that a statutory violation considered to be negligence *per se* would alone necessarily indicate wilful and wanton conduct.

Various witnesses to the accident reported that they heard the train's whistle, bells and horns prior to the accident. Plaintiffs note that these witnesses, however, were members of a utility crew working outdoors and not persons on the road at the time. They claim that the testimony of two "disinterested witnesses" who were approaching the crossing at the time of the accident further supports their allegations of a lack of adequate warning.

William Putz, who was driving westbound on Route 30, testified that the flashing lights were not operating when he was approximately 100 to 150 yards from the crossing. He stated that, after he saw the train and began braking when he was 50 to 100 feet from the intersection, he looked up and saw the lights flashing at that time. He indicated that they were on for less than five or six seconds. Putz stated that he heard nothing nor saw lights on the train prior to seeing the collision occur. Upon cross-examination, Putz agreed that he had previously signed a statement indicating that he did not remember whether the whistle or bell was sounding and that the flashing lights were on for no more than 10 seconds.

Lawrence Carpenter testified that he was driving eastbound on Route 30 at the time of the accident. He stated that he first observed the flashing lights go on when he was 75 to 100 yards from the crossing, although he had earlier admitted that he could have been as far as 125 yards from the crossing. He stated that the Anderson vehicle had been in the lane to his left, traveling at a faster speed than he was, and passed him when he was in the process of stopping for the train. He agreed that he had seen only the light to the right side of the road. Carpenter indicated that, as best he recalled, he did not hear the train whistle until the train was about to enter the roadway, and he saw the train only briefly before that time.

Plaintiffs also alleged that C&O failed to take reasonable steps to prevent the collision upon becoming aware of the danger of an impending accident. Numerous witnesses, however, testified that they felt the train go into a braking position before impact. The evidence adduced at trial further does not support plaintiffs' allegation that defendant failed to maintain a proper lookout. The train fire-

man, seated to the left of the engineer, testified that he had a clear view of the Anderson vehicle in the eastbound lanes of the highway. Although the train engineer indicated that his view of the eastbound lanes was somewhat obstructed, the fireman stated that he yelled to the engineer as soon as he saw the Anderson vehicle approaching the crossing, and the engineer immediately applied the emergency braking system.

In addition to plaintiffs' allegations regarding the condition of the crossing site itself, plaintiffs maintain that C&O had knowledge of "numerous prior accidents" and, therefore, exhibited a conscious disregard for the safety of others by allowing the crossing to continue to exist in a dangerous condition. C&O, however, had indicated that it was aware of only three other accidents at the Route 30 crossing in the 10 years preceding the accident in question. In support of their position, plaintiffs called upon Louise Tucker, head librarian at the Gary, Indiana, Post Tribune newspaper, who testified that three articles concerning two accidents of which C&O claimed to be unaware had been reported in the newspaper.

We believe that defendant's claim that it was unaware of the additional accidents is not necessarily indicative of wilful and wanton conduct on its part. There was, for example, no evidence presented that defendant knew of and refused to remedy or repair a specific dangerous condition which was causing the accidents at the crossing. (See, *e.g., Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 710-11, 450 N.E.2d 1199.) The case before us is distinguishable from others where wilful and wanton conduct has been found based on a defendant's failure to respond to notice of dangerous crossings. In *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329, the mayor filed a petition with the Illinois Commerce Commission, on behalf of his townspeople, requesting that protection be upgraded at crossings after numerous accidents had occurred. Similarly, in *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113, after a number of accidents, village officials repeatedly met with railroad representatives and the Illinois Commerce Commission, the school district P.T.A. president wrote to the railroad, and a coroner's jury inquiring into a fatality recommended signals for the railroad crossing. In both cases, the court found that defendants had notice which would show that the crossing protection was inadequate, which could then be appropriately considered by the jury in determining whether the conduct was wilful and wanton. In contrast, in the instant case, the evidence presented revealed only that newspa-

per editorials had been published regarding two of the accidents; there was no evidence of additional community or official followup or concern.

■■ Based on the evidence presented, we agree with C&O that the trial court should have directed a verdict in its favor on the wilful and wanton counts. Despite plaintiffs' numerous allegations, there was no evidence of a level of recklessness, carelessness, or a conscious disregard for the safety of others that would provide the basis for a finding of wilful and wanton conduct. Even when viewed in a light most favorable to plaintiffs, the evidence in this case simply was not sufficient to withstand a motion for a directed verdict. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

C&O next contends that the trial court also erred in granting a new trial on issues involving compensatory damages because the jury verdict was supported by the evidence. C&O urges this court to reinstate the compensatory damages verdict. Plaintiffs, in contrast, maintain that, even if the verdict was supported by the evidence, the court committed numerous errors which deprived them of a fair trial and, therefore, a new trial is warranted. We address the alleged errors to determine whether or not the trial court erred in granting a new trial on compensatory damages.

■■ Plaintiffs first submit that, under Indiana law, the combination of three instructions given to the jury regarding the duty of a motorist at a railroad crossing was erroneous. The instructions were as follows:

"Instruction No. 4—It is the duty of every driver of a vehicle using a public highway to exercise ordinary care at all times to avoid placing her or others in danger and to exercise ordinary care at all times to avoid a collision.

Instruction No. 5—Travelers on a public highway, in attempting to pass over railroad crossings, are required to look and listen for the approach of trains.

Instruction No. 6—There was in force in the State of Indiana at the time of the occurrence in question a certain statute which provided that:

'Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty feet but not less than ten feet from the nearest track of such railroad and shall not proceed until he can do so safely when either: 1) a clearly visible electric signal device gives warning of the immediate approach of a train; 2)

a railroad train approaching within 1500 feet of a highway crossing emits a signal audible for such distance and such train, by reason of its speed or nearness to such crossing, is an immediate hazard; or 3) an approaching train is plainly visible and is in hazardous proximity to such crossing.'

If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was contributorily negligent before and at the time of the occurrence."

Plaintiffs argue that, although a motorist crossing a railroad track in Indiana is to use his "senses of sight and hearing" (*Pennsylvania R.R. Co. v. Mink* (1966), 138 Ind. App. 311, 320-21, 212 N.E.2d 784, 790, citing *Central Indiana Ry. Co. v. Wishard* (1917), 186 Ind. 262, 268-69, 114 N.E. 970, 972), there was no duty to stop or look or listen at a particular place. Rather, plaintiffs urge, the motorist is to exercise reasonable care "at some place where such precautions would enable him *** to see or hear the approach of a train." (*Pennsylvania R.R. Co. v. Mink* (1966), 138 Ind. App. 311, 320-21, 212 N.E.2d 784, 790.) Plaintiffs further contend that whether a duty to look and listen exists and how such a duty is to be applied is a question for the jury and depends on the facts and circumstances in the case. They argue that Instruction No. 6 further tainted the jury's verdict regarding the relative fault of the parties involved.

We disagree with plaintiffs' interpretation of Indiana law regarding a motorist's duty to stop, to look and/or to listen. Indiana common law provides that, other than any statutory duties, a motorist on a highway must exercise reasonable or ordinary care to avoid injury in approaching a railroad crossing. (*New York Central Ry. Co. v. Powell* (1943), 221 Ind. 321, 335, 47 N.E.2d 615, 620-21; *New York Central R.R. Co. v. Casey* (1938), 214 Ind. 464, 472, 14 N.E.2d 714, 717-18.) Instruction No. 4 submitted by defendant and subsequently given to the jury does nothing more than generally restate Indiana law on this topic. Instruction No. 5 also restates the applicable case law. We find no error by the trial court in giving these two instructions.

We further disagree with plaintiffs that Instruction No. 6 gave the jury members the impression that it was incumbent upon them to find that Harriet Anderson had an absolute duty to "stop, look and listen" at the railroad crossing. This instruction properly sets forth Indiana law (Ind. Code Ann. sec. 9—4—1—106 (West 1979)),

which delineates those conditions under which a motorist approaching a railroad crossing has a statutory duty to stop. The statute specifies the limited number of situations in which this duty exists; it does not state that a motorist necessarily would have a duty to "stop, look and listen" under the particular circumstances attending the accident in question. Rather, it was for the jury to determine whether Harriet Anderson was required to stop at the Route 30 crossing given the evidence presented. (See *e.g., Paulison v. Chicago, Milwaukee, St. Paul & Pacific R.R., Inc.* (1979), 74 Ill. App. 3d 282, 291-92, 392 N.E.2d 960.) We believe the instruction was clear in its wording.

■ We next consider plaintiffs' contention that the trial court committed reversible error in refusing to tender to the jury an instruction regarding the rate of speed at which C&O was required to operate its trains. During the instruction conference, plaintiffs tendered a railroad-crossing speed instruction taken from Indiana Pattern Jury Instruction section 17.43 (The Bobbs-Merrill Co., Inc. 1966). This instruction states that, "[i]n the absence of an ordinance to the contrary, there is no speed limit at which the defendant shall operate its trains, but the speed must be consistent with the exercise of ordinary care ***." The court refused to give the instruction, indicating that the speed of the train was not at issue in the case.

We believe that the trial court was correct. Jury instructions should inform the jury of the issues presented, the principles of law to be applied, and the facts which must be proved to support a verdict. (*Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 508, 394 N.E.2d 1273; *Winston v. Chicago Transit Authority* (1971), 2 Ill. App. 3d 151, 156, 276 N.E.2d 65.) At trial, plaintiffs' expert, Dr. John Baerwald, testified that the Route 30 crossing was inadequately protected if trains traveled over it at 60 miles per hour, the rate of speed approved by C&O for its trains passing through that location. However, plaintiffs did not allege in their complaint that defendant's train, traveling at 50 miles per hour according to witnesses, was operating at an excessive speed or that the speed of the train contributed in any way to the accident. Because it was the adequacy of the crossing protection and not the train's rate of speed which was at issue, there was no necessity that Indiana Pattern Jury Instruction section 17.43 be given. The trial court did not abuse its discretion in refusing to give the instruction, and plaintiffs were not prejudiced thereby.

■ ■ Plaintiffs also allege error in the court's refusal to instruct the jury according to Illinois Pattern Jury Instruction, Civil,

No. 5.01 (2d ed. 1971). This instruction permits an adverse inference to be drawn from a party's failure to produce particular evidence or a witness only when some foundation is presented on each of the following elements: (1) the evidence/witness was under the control of the party and could have been produced by the exercise of reasonable diligence; (2) the evidence/witness was not equally available to an adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence or produced the witness if he believed the testimony would have been favorable to him; and (4) no reasonable excuse for the failure has been shown. (*Matelis v. City of Chicago* (1983), 112 Ill. App. 3d 683, 688, 445 N.E.2d 1226; *Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 318, 367 N.E.2d 472.) Plaintiffs maintain that instruction No. 5.01 should have been given because C&O denied knowing of prior accidents which occurred at the Route 30 crossing, failed to produce or offer any explanation for the absence of its employees who performed tests upon the flashing lights in question, and failed to produce the accident report of the train engineer.

Robert McCoy, senior claims agent for C&O, testified that defendant was aware of only three prior accidents at the Route 30 crossing. Plaintiffs claim that, because a number of additional accidents occurred at the crossing, defendant withheld evidence within its knowledge from the plaintiffs. We disagree. As noted above, defendant disclosed to plaintiffs its knowledge of three accidents and claimed that the other accidents had not been reported to it. Plaintiffs were able to introduce before the jury members the dates of newspaper articles documenting the additional accidents and deaths that occurred at the crossing site. Thus, evidence of all the alleged accidents was presented to the jury which could then adequately evaluate defendant's credibility in its claims that it knew of no more than three prior accidents.

Plaintiffs also complain that the trial court should have given instruction No. 5.01 because defendant failed to produce the employees who tested the flashing lights. During the instruction conference, defendant explained that one man was deceased and the other too ill to testify and, in addition, no longer employed by the company. Instruction No. 5.01 is properly given to a jury when some foundation has been presented that a witness was under the control of the party that failed to produce that witness. In the instant case, there was no evidence that either man was under C&O's control. In fact, at the instruction conference C&O offered plaintiff information to the contrary, and plaintiff produced nothing at trial to refute that

explanation. Further, both the record book concerning maintenance of the flashing lights and the testimony of Orville Nealis, supervisor of signals and communications, were before the jury to evaluate on the issue regarding the flashing lights.

Plaintiffs further complain that C&O refused to produce an "accident report" written by the train engineer after the collision. They emphasize that an unfavorable evidentiary presumption arises if a party fails to produce evidence, without reasonable excuse, which is under its control. See *Nakis v. Amabile* (1981), 103 Ill. App. 3d 840, 846, 431 N.E.2d 1255; *Fuery v. Rego Co.* (1979), 71 Ill. App. 3d 739, 744, 390 N.E.2d 97.

C&O's train engineer, Roger Leedy, testified during a deposition taken by plaintiffs about his completion of a report regarding the Anderson accident. At trial, plaintiffs' counsel attempted to impeach Leedy's testimony by attempting to establish that Leedy had completed an "accident report" which was not submitted to plaintiffs as requested. A review of the record indicates that two types of reports may be completed by railroad employees when a train is involved in an accident—an "accident report" and a "delay report." Although the record reveals a great deal of confusion about which employee filled out which report, it was clear from Leedy's testimony on both direct and cross-examination that he had completed only one of these reports. This single report, then, was the form presented to plaintiffs during discovery. Mr. Leedy clearly explained that he had completed only one report and not two, and there thus was a "reasonable excuse" for C&O's failure to submit a second report to plaintiffs.

Therefore, because the jury had information regarding prior accidents, because no evidence demonstrated that the two men who performed tests on the flashing lights were still under C&O's control, and because C&O had a reasonable excuse for not producing an "accident report," the trial court did not abuse its discretion in refusing to give Illinois Pattern Jury Instruction, Civil, No. 5.01 (2d ed. 1971). Where plaintiffs cannot show that they have been prejudiced by the failure to give specific instructions, a case will not be reversed on those grounds alone. See *Hatfield v. Sandor-Wander, Inc.* (1984), 124 Ill. App. 3d 780, 790, 464 N.E.2d 1105.

■■ Plaintiffs also contend that the trial court improperly limited the testimony of Louise Tucker, the head librarian at the Gary Post Tribune. Mrs. Tucker was permitted to testify that three newspaper articles appeared regarding two prior accidents at the Route 30 crossing. Plaintiffs complain, however, that the articles them-

selves should have been submitted to the jury as evidence of notice to the defendant of the extrahazardous nature of the crossing. The parties also differed as to whether Illinois or Indiana law should apply regarding the admission of this evidence.

Under Illinois law, a plaintiff alleging that a defendant had notice that an accident site is of a generally hazardous nature is allowed to enter evidence of any previous accidents, whether similar or dissimilar. In neither situation, however, is the plaintiff permitted to enter into evidence any of the factual details of the accidents. (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 759, 449 N.E.2d 942.) Under Indiana law, evidence of prior accidents to show notice of a dangerous condition is admissible only if the accidents were of a similar nature to the one in question. (*State of Indiana By & Through the Indiana State Highway Com. v. Fair* (Ind. App. 1981), 423 N.E.2d 738, 740.) Here there was no showing that the accidents about which Louise Tucker testified were similar in the "essential conditions surrounding them" as required under Indiana law. (*Craven v. Niagara Machine & Tool Works, Inc.* (Ind. App. 1981), 417 N.E.2d 1165, 1172.) Thus, under the law of either State, details of the prior accidents in this case, which the jury would have received if the newspaper articles were received in evidence, were properly withheld from the jury. Plaintiffs were not prejudiced in any manner, because they were permitted to place before the jury the fact that additional accidents, of which defendant claimed to be unaware, did take place at the Route 30 crossing. Mrs. Tucker's testimony, therefore, was appropriately limited by the trial court.

At trial, plaintiffs also sought to admit the testimony of E. Gene Mechling regarding the condition of the flashing lights two days after the Anderson collision. In an offer of proof, Mr. Mechling indicated that the flashing lights to the left of the crossing were not working when he approached the Route 30 intersection. He claimed that, as a result, he had to swerve his vehicle into a ditch to avoid an oncoming train.

We find that this testimony was properly excluded. According to the trial court, Mr. Mechling was a "surprise witness," and the prejudicial effect of his testimony could far outweigh its probative value. Although plaintiffs were aware of the existence of Mr. Mechling as much as two months before trial, defendant became aware of him one week into the trial when plaintiffs' counsel attempted to present his testimony.

In summary, we find that the trial court did not commit revers-

ible error on the preceding issues. We further find that the trial court erred in ordering a new trial on the issues involving compensatory damages.

Finally, defendant contends that the testimony of plaintiffs' expert witness, Dr. John Baerwald, should not have been admitted because he testified as to an "ultimate issue" in the case, that is, whether the crossing was "extrahazardous." C&O argues that such an issue should have been determined solely by the jury as a conclusion from the facts. We disagree. Because the jury is free to reject the testimony, such expert testimony is now considered admissible even if it is directed toward an ultimate issue in a case. (*Johnson v. Commonwealth Edison Co.* (1985), 133 Ill. App. 3d 472, 484, 478 N.E.2d 1057; *Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 1072, 448 N.E.2d 188.) "The rule of law that testimony on ultimate issues is admissible only upon subjects beyond the understanding of the average juror, is outdated law." (*Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 564, 461 N.E.2d 57.) The current standard as to the admissibility of expert testimony is whether it will aid the jury in the understanding of the facts. (*Johnson v. Commonwealth Edison Co.* (1985), 133 Ill. App. 3d 472, 478 N.E.2d 1057; *Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 461 N.E.2d 57; *Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 448 N.E.2d 188.) The testimony of Dr. Baerwald in this case was properly admitted by the trial court.

For the foregoing reasons those portions of the August 2, 1983, order of the circuit court of Cook County which granted a mistrial on the court's own motion based upon the inconsistency of the verdicts, which ordered a new trial on all issues, and which vacated that portion of the June 16, 1982, order which entered judgment on the jury verdicts awarding compensatory damages are vacated; that portion of the order of August 2, 1983, which denied defendant's motion for judgment notwithstanding the verdict on the issue of exemplary damages is vacated, and judgment is entered for defendant on said motion; and judgment is reinstated on the jury verdicts which awarded compensatory damages.

Vacated in part, judgment entered on defendant's motion for judgment notwithstanding the verdict on the issue of exemplary damages, and judgment is reinstated on jury verdicts which awarded compensatory damages.

RIZZI, P.J., and WHITE, J., concur.